Sylvia A. Goldsmith (Admitted *Pro Hac Vice*)
LAW OFFICE OF SYLVIA A. GOLDSMITH
Milano Law Building, 2639 Wooster Road
Rocky River, Ohio  44116
Telephone:  (440) 934-3025
Facsimile:  (440) 934-3026
Email: sgoldsmith@sgoldsmithlawoffice.com

Ryan T. Earl (Idaho Bar #8342)
EARL & EARL, PLLC
212 10th Avenue South
Nampa, Idaho 83651
Telephone: (208) 890-0355
Facsimile: (208) 461-9560
Email: ryantearlattorneyatlaw@yahoo.com

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| **JOSE LUIS CALDERON**, | ) | |
| | ) | CASE NO.: 1:11-CV-00386-EJL |
| Plaintiff, | ) | |
| | ) | JUDGE LODGE |
| v. | ) | |
| | ) | |
| **EXPERIAN INFORMATION SOLUTIONS, INC.**, | ) ) | |
| | ) | |
| Defendant. | ) | |

**REPLY MEMORANDUM IN SUPPORT OF**

**PLAINITFF'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS**

A.      **Relevant Background Information.**

While Experian claims "[t]here is no evidence that Plaintiff's credit file was improperly merged with another consumer," it concedes Plaintiff was strapped with at least two highly negative accounts "that may have properly belonged to another person[.]" *See* EXP Memo. at 2.  This contradiction in Experian's positions stems in no small part from the fact that Experian deliberately uses terms like "merged" versus "mixed" files without properly explaining the very distinct meanings these concepts have in the credit reporting world.

Mixed files have been the subject of regulatory enforcement actions by the Federal Trade Commission and the Attorneys General of 17 states (including the State of Idaho), as well as numerous lawsuits and consumer complaints over the last two decades.  *See FTC v. TRW, Inc.*, 784 F.Supp. 361 (N.D.Tx.1991); *TRW, Inc. v. Dan Morales, Attorney General of the State of Texas, et al.*, unreported, Civil Action No 3-91-1340-H (Judge Barefoot Sanders), N.D. Texas, December 10, 1991 (courtesy copies are attached hereto as Exhibit 1).[1]

A "'Mixed File' refers to a Consumer Report in which some or all of the information pertains to a person or persons other than the person who is the subject of the Consumer Report."  *See TRW*, *supra,* unreported, Civil Action No 3-91-1340-H at ¶ C, 6.  On numerous instances in the last several years, Experian published to Plaintiff's current and prospective creditors a credit report that included a public record civil judgment taken by Portfolio Recovery and an unrelated NCO collection account, even though these items pertain to someone *other than* Plaintiff.  By definition, the instant case involves a mixed file.  So the necessary question is:  how "mixed" is Plaintiff's credit information in Experian's database?

---

[1] TRW was the predecessor company of Experian.

1

**B.      Plaintiff Is Entitled To See ALL Information About Him In Experian's Database Regardless Of Where It Is Stored.**

To cloud this core issue – an issue that not only goes to proof of Plaintiff's liability claims but also necessarily defines the breadth of his injuries – Experian throws around the term "credit file" in a manner completely inconsistent with the definition provided by the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq*.  For instance, in trying to limit Plaintiff's discovery to just those matters related to the public record judgment and NCO collection account, Experian argues that "Plaintiff's FCRA claims relate solely to alleged inaccuracies in, disclosure of, and investigation of Plaintiff's individual credit file." *See* EXP Memo. at 6.  However, "[t]he term 'file,' when used in connection with information on any consumer, means **all** *of the information on that consumer recorded and retained by a consumer reporting agency **regardless of how the information is stored*** (emphasis added)." *See* 15 U.S.C. § 1681*a*(g).

Based on the FCRA's definition, Plaintiff's discovery requests deliberately seek ***all*** information in Experian's database ***about Plaintiff***, irrespective of whether that information is contained under one personal identification number ("PIN"), or under more than one PIN.[2] There is no other way to confirm the full extent of the mixed file at issue.  But Experian refuses to produce documents associated with any PIN other than the one Experian has unilaterally determined "belongs" to Plaintiff, reasoning that "any information contained in an unrelated consumer's credit file" is irrelevant here. *See* EXP Memo. at 7.  The error in this logic was exposed in a strikingly similar mixed file case titled *Brenda Faith Campbell v. Experian Information Solutions, Inc.*, Case No. 08-04217-CV-C-NKL (W.D. Mo. 2009).

---

[2] To date, Experian has only produced documents associated with "the" PIN Experian has unilaterally determined "belongs" to Plaintiff.

In *Campbell*, the mixed file involved three (3) different individuals with the name "Brenda Campbell," all of whom reside in the State of Missouri. While each had a distinct middle name, Social Security number, date of birth, and address, Experian's reliance on the similarity in the first and last name, as well as the general geographic region (which at various points overlapped in City as well as State), resulted in information about all three (3) ladies being included under a single PIN. That PIN was deemed by Experian to be the *Campbell* plaintiff's "credit file." So when she requested *her* credit report, she received a report that showed information belonging to all three (3) ladies.[3] Because that one single credit report showed multiple name variations and addresses, as well as four (4) different Social Security numbers, it was fairly easy to determine not only that the file was mixed but also the specific individuals involved in the mixture. But had either of the other ladies named "Brenda Campbell" initiated the mixed file inquiry, the full extent of the mixture probably would have gone undetected.[4]

In *Campbell*, as is the case here, Experian refused to produce the Admin Reports, D/R Logs and Disclosure Logs associated with the PINs of the other individuals named "Brenda Campbell" on the grounds that such information was irrelevant and arguably invaded the privacy of the other consumers. Recognizing that the only way to fully identify the extent of the mixture and, more importantly, to confirm the un-mixing of the files was successful and complete, was to look at the reports of all three (3) ladies, and also acknowledging that plaintiff had a right to conduct that examination herself and not merely rely upon Experian's word, the court ordered

---

[3] As a result, the full names, addresses, dates of birth, Social Security numbers and employment information (as well as partial credit history) of the other two ladies were disclosed by Experian to the *Campbell* plaintiff.
[4] Each of the other mixed file victims in *Campbell* had a separate PIN of their own (albeit limited to the information that was not mixed under the *Campbell* plaintiff's PIN), so when they requested their own credit reports, they were provided what appeared to be "clean" and complete files.

production of the necessary documents.  *See Campbell*, *supra*, Case No. 08-04217-CV-C-NKL (W.D. Mo. June 11, 2009) at Document No. 53.[5]

Without establishing the full extent to which some of Plaintiff's information is contained under a PIN (or PINs) other than the one Experian has produced, neither party can ascertain whether the full extent of Plaintiff's problems have been resolved.[6]  In some ways, the need for the disclosure in this case is even greater than in *Campbell* because Plaintiff's personal identifying information, like that of the non-plaintiffs in *Campbell*, may be included under another PIN(s) and therefore being circulated illegally.  For Experian to be permitted to conceal the extent to which this is happening is unjust.

C. **Experian's Matching Algorithms Are Key To How The Instant Mixed File Occurred, And Are The Only Source of Determining The Breadth Of The Problem.**

Experian tries to create this impression that it is just a "warehouse" of information with items flowing in and out with little control or authority by Experian.  *See* EXP Memo. at 3.  That simply is not true.  Experian is the *sole* gatekeeper of the highly personal and private consumer information it collects and sells, making *all* decisions and rules about the information in its *own* database, and earning a fortune for its choice to accept the "grave responsibilities" imposed by the FCRA in this role.  *See* 15 U.S.C. § 1681(a).[7]

Experian exclusively decides who it allows to access its database.  Only those "subscribers" who accept a written contract with Experian are allowed access, in the form of

---

[5] Experian represents that it "may not disclose the consumer reports of non-party consumers in response to Plaintiff's discovery requests[,]" *see* EXP Memo. at 5, without acknowledging that the FCRA specifically provides for disclosure in instances such as this pursuant to Court order.  *See* 15 U.S.C. § 1681*b* (a)(1).

[6] To rely exclusively on Experian's determination in this regard is a bit like putting the fox in charge of the henhouse, especially considering that Experian's opposition suggests that it has not even *looked* at the files of the other individuals in the greater Nampa, Idaho area with the name "Jose Calderon" to see if any of Plaintiff's information is in there.

[7] It is important to remember that these "grave responsibilities" are not solely consumer protective but, in fact, are critical to the integrity and efficiency of our banking system and economy.  *See* 15 U.S.C. § 1681 (a)(1).  To wit, Plaintiff was unable to buy a home as well as make numerous other purchases because Experian created a false impression in the minds of various businesses as to Plaintiff's credit ability.

4

reporting information *to* as well as pulling information *from*, Experian's database. Experian controls the requirements for the manner and extent to which specific fields of information are to be supplied, and is the one who must train its subscribers on Experian's requirements.

Experian is also exclusively in control of where the information supplied by its subscribers ends up in Experian's database. Experian, alone, designs the rules or "algorithms" that control where information will be stored in Experian's database. For instance, when a creditor reports information *to* Experian about a consumer, Experian has to decide to which consumer in its database that information belongs. Plaintiff believes Experian has developed a matching algorithm to do so that weighs various pieces of identifying information reported by the creditor against the identifying information Experian already has in its database. Upon information and belief, when Experian satisfies itself that it has a sufficient match, the incoming piece of information from the creditor is assigned to or "affixed" to that consumer's PIN so that it is included in subsequent credit reports issued about that consumer.

Likewise, when a prospective creditor requests *from* Experian a credit report about a consumer, Experian has to decide which consumer within its database that prospective creditor is inquiring about. Again, Plaintiff believes Experian relies on another matching algorithm that weighs the pieces of identifying information supplied by the prospective creditor against the identifying information Experian already has. Upon information and belief, when Experian satisfies itself that it has a sufficient match, a credit report (or possibly more than one credit report) will be returned by Experian to the prospective creditor as "the" credit report that was requested.

With respect to the algorithm Experian employs in either situation, the strength of any given match will necessarily depend on how extensive the identifying information provided

5

is.[8] And mistakes will invariably occur. Whether caused by similarities in identifying information or typographical errors making it appear as such, information belonging to one person may end up under the PIN of another (and vice versa). But since the matching algorithms presumably weigh a number of different fields of identifying information, *e.g.*, first name, middle name, last name, date of birth, Social Security number, street address, City, State, etc., a small, easily identifiable error can snowball into a full-blown "merged" credit file where the information included under multiple PINs is determined to belong to one (1) person, thereby merging the information from the individual PINs into one.[9]

Without examining Experian's various matching algorithms, it is impossible for Plaintiff to determine who else he may be mixed with.[10] While Experian readily represents that "two accounts that may have properly belonged to another person named "Jose Calderon" living at Plaintiff's address were ascribed to Plaintiff's credit file," *see* Experian's Opposition at 2, the question of what happened in the instant case goes far beyond those known facts.[11]

To be clear, both Plaintiff (Jose Luis Calderon) and his father (Jose C. Calderon) will testify under oath that the public record judgment is not theirs. This is consistent with the

---

[8] Again, as the owner of the database, Experian exclusively determines how much and which specific information it requires its subscribers to provide.

[9] Upon information and belief, there is yet a third matching algorithm that is relied upon to determine whether the information associated with two (2) or more different PINs should be "merged" together into one.

[10] While Experian is not strictly liable for the appearance of inaccurate information reported about Plaintiff, liability arises when "the inaccuracy result[s] from the agency's failure to follow reasonable procedures to assure maximum possible accuracy." *See, e.g.*, *Graham v. CSC Credit Services*, 306 F.Supp.2d 873, 877-878 (D.Minn. 2004)(citing *Houser v. Equifax, Inc.*, 602 F.2d 811, 814 (8th Cir. 1979)). Experian knows that preventing Plaintiff from reviewing the underlying procedure, *i.e.*, the matching algorithms that caused the mixed file, will all but destroy Plaintiff's ability to prove his claim under 15 U.S.C. § 1681*e* (b) that Experian's reliance on partial matching in the face of a known and long-standing mixed file history is unreasonable. To allow Experian to hide behind confidentiality as a means to prevent Plaintiff from building this part of his case is patently unfair.

[11] Plaintiff acknowledges that the public record judgment at issue here purports to relate to a lawsuit where Plaintiff's address was included on the original Complaint, but that does not mean that the judgment "properly belong[s]" to someone living at Plaintiff's address as Experian represents; it only means that the creditor used that address when filing the complaint. In this day and age, where debt collectors routinely pull a credit report before filing suit, it is not uncommon for an error to occur, especially in a case such as this where it is known that multiple people with the same first and last name reside in the same geographic area.

fact that the outstanding judgment appears to have been *paid* by a wholly unrelated individual (Jose Zuniga Calderon).[12]  This confirms not only that, irrespective of the mistake in address, the subject judgment belongs to neither Plaintiff nor his father, but also that there is clearly at least one other individual with the same first and last name whose debts have somehow been linked (albeit wrongly) to Plaintiff's address.  And as noted above, with that "match" of name and address, who knows what further mixture of information has occurred?  Only through an examination of the information associated with the PINs of all three (3) individuals can the parties possibly determine the full extent of the mixture at issue here.

> D.  **There Is A Protective Order In Place to Protect Experian's Interests.**

Experian goes on for almost five (5) pages about how Plaintiff should be denied access to critical information about how and to what extent his information is mixed together with others in Experian's database because the underlying matching algorithms which caused (and could continue to cause) that mixture are "highly confidential."  Yet notably, in trying to identify the alleged "risk" that production of such information in this litigation poses,[13] Experian never once suggests that Plaintiff or his counsel fall into *any* of the alleged risk categories, or otherwise should not be trusted to review the confidential materials for use in the instant case.

Even assuming, *arguendo*, Experian could articulate a risk posed by production of confidential materials to Plaintiff and his counsel, this Court has already entered the Protective

---

[12] Plaintiff and his father will testify that the NCO collection account is neither of theirs as well.  To date, Plaintiff has insufficient information to determine whether that NCO collection account belongs to the "Jose Zuniga Calderon" that paid the public record judgment, or if it is related to yet a fourth "Jose Calderon."

[13] For instance, Experian argues that if the "highly confidential" information fell into the hands of Experian's competitors (or prospective competitors), they might be able to replicate Experian's system thereby destroying Experian's claimed "competitive advantages in the credit reporting industry."  *See* EXP Memo. at 11.  Neither Plaintiff nor his counsel is looking to break into the credit reporting arena or seeking to "develop a rival system by obtaining Experian's secrets."  *Id.*  Plaintiff just wants to get to the bottom of how mixed up his Experian information really is so he can know, once and for all, that his problems are fully and finally corrected.

Order requested by Experian to cover such concerns. In fact, the Protective Order specifically provides for heightened protection of documents that Experian deems are *super*-secret.

> If a Producing Party believes in good faith that, despite the provisions of this Protective Order, there is a substantial risk of identifiable harm if particular documents it designates as "Confidential" are disclosed to all other Parties or non-parties to this action, the Producing Party may designate those Particular documents as "Confidential – Attorneys' Eyes Only."

*See* Protective Order at 2, ¶ 3.

Finally, while claiming that the information is too risky to be shared with anyone outside of Experian, Experian represents it "has offered to provide Plaintiff with the information requested, i.e. – the testimony of witnesses with knowledge of Experian's matching procedures." *See* EXP Memo. at 12. First, this is the first time Plaintiff has heard anything about this "offer." Second, if the information is truly the same, why would a witness' testimony be any more secure? Plaintiff submits that Experian is trying to placate Plaintiff with a promise to produce critical information that, when push comes to shove, will be filtered through a professional witness who has been coached to provide Plaintiff with a limited view of the actual algorithms at issue. Plaintiff is entitled to examine the documentary evidence of the procedures at issue and then depose the appropriate witness(es) of his choosing about same.

### E. Experian Is Trying To Hide Crucial Information About The Handling Of Plaintiff's Disputes.

Every one of Plaintiff's fourteen (14) disputes of the false information in his ***Experian*** credit report was addressed to ***Experian*** at an address in Allen, Texas. Plaintiff would systematically receive a responsive communication with ***Experian's*** logo in the corner, and usually reminding Plaintiff that he could contact ***Experian*** at its United States website, [www.*experian*.com](http://www.experian.com). Nevertheless, and despite the repeated use of the phrases such as "***our*** investigation" and "description of how ***we*** verified the information," Experian claims it cannot produce a single piece of information about the individuals who processed any of these

8

communications because "***all persons who received communications from Plaintiff or reviewed his disputes are non-parties*** (emphasis added)." See EXP Memo. at 14.[14]  There is something inherently dishonest about Experian's effort to hide the *only* information about how, when and why Plaintiff's disputes were handled as they were, and the details of by whom, behind a corporate shell game.  At a minimum, with Experian Services Chile, S.A. handling every aspect of Plaintiff's disputes, Experian should be in a position to request the necessary information from that non-party.[15]

F. **Experian's Knowledge and Motivations Are Key Factors In Determining The Willfulness (or Lack Thereof) of Experian's Actions.**

This case involves a claim for willful violations of the FCRA.  To prove this, Plaintiff must develop evidence that Experian's actions were taken with "reckless disregard," *i.e.*, with "'an unjustifiably high risk of harm that is either known or so obvious that it should be known.'"  See *Safeco Ins. Co. of American v. Burr*, 551 U.S. 47, 68, 127 S.Ct. 2201, 2215, 167 L.E.2d 1045, 1065 (quoting *Farmer v. Brennan, 511 U.S. 825, 836, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994)*).[16]

Plaintiff's requests for information about Experian's motivations and notice/knowledge of ongoing mixed file problems (as discussed in greater factual depth in Plaintiff's *Memorandum in Support*) go directly toward proof that Experian acted recklessly here.  For instance, Experian touts a "unique method for promoting and rewarding high-quality

---

[14] To wit, these individuals are employees of Experian Services Chile, S.A.

[15] Since the identification of Experian Services Chile, S.A.'s involvement in this case, Plaintiff has served additional discovery requesting specific information about any common corporate ownership or contract between the seemingly-related entities.  Anticipating that Experian will continue to play games on this issue, Plaintiff has also begun the process of determining how to compel this non-party located in Santiago, Chile to appear for a telephone deposition in this case.  Both efforts impose considerable additional time and expense on Plaintiff to obtain information that seemingly is within Experian's control.

[16] The *Safeco* Court ultimately concluded that the insurance company's failure to provide a required adverse action notice based on the use of a credit report was not "willful" under the FCRA unless the action was both "a violation under a reasonable reading of the statute's terms" and the insurance company "ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Safeco*, *supra*, 551 U.S. at 69.

and efficient work[,]" *see* EXP Memo. 11, yet they are unwilling to allow Plaintiff to explore that method, or the financial decisions and incentives underlying it to determine if Experian made a calculated choice to invest in expediting reinvestigations rather than assuring accuracy. Similarly, in enunciating the "recklessness" standard under the FCRA, the *Safeco* court made a distinction that "[t]his is not a case in which the business subject to the Act had the benefit of guidance from the courts of appeals or the Federal Trade Commission [FTC] that might have warned it away from the view it took."  Thus, Plaintiff has sought information about other mixed file lawsuits Experian has been involved in to help determine if Experian's conduct in this instance was done pursuant to a "reasonable" reading of the statute.[17]  There is no legitimate basis to withhold this information which goes to key elements of Plaintiff's claims.

## CONCLUSION

Experian's desire to keep Plaintiff from uncovering potentially damaging information is not a proper basis to withhold discovery.  For all of the reasons stated herein and for those already enumerated in Plaintiff's Memorandum in Support, Plaintiff respectfully asks this Court to Order Experian to produce all documents responsive to Requests for Production Nos. 1 – 4, 9, 13 – 17, 20 and 21 without further delay.

    Respectfully submitted,

     /s/ Sylvia A. Goldsmith
    Sylvia A. Goldsmith (Admitted *Pro Hac Vice*)
    LAW OFFICE OF SYLVIA A. GOLDSMITH
    Milano Law Building, 2639 Wooster Road
    Rocky River, Ohio  44116
    Telephone:  (440) 934-3025
    Facsimile:  (440) 934-3026
    Email: sgoldsmith@sgoldsmithlawoffice.com

---

[17] As noted previously, Experian has *volunteered* some of this information in other litigation already.  *See* Plaintiff's Memo. in Support at 14.

        Ryan T. Earl (Idaho Bar #8342)
        EARL & EARL, PLLC
        212 10th Avenue South
        Nampa, Idaho 83651
        Telephone: (208) 890-0355
        Facsimile: (208) 461-9560
        Email: ryantearlattorneyatlaw@yahoo.com

        Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and accurate copy of the foregoing *Plaintiff's Reply Memorandum in Support of Plaintiff's Motion to Compel Production of Documents* is being filed electronically with the United States District Court for the District of Idaho, on this 18th day of April 2012. Notice of this filing will be transmitted to counsel of record by operation of the Court's electronic filing system.

        /s/ Sylvia A. Goldsmith
        Sylvia A. Goldsmith (Ohio Bar #0064871)
        LAW OFFICE OF SYLVIA A. GOLDSMITH
        Attorney for Plaintiff