Sylvia A. Goldsmith (Admitted *Pro Hac Vice*)
Geoff B. McCarrell, Esq.
LAW OFFICE OF SYLVIA A. GOLDSMITH
Milano Law Building
2639 Wooster Road
Rocky River, Ohio  44116
Telephone:  (440) 934-3025
Facsimile:  (440) 934-3026
Email: sgoldsmith@sgoldsmithlawoffice.com
Email: gmccarrell@sgoldsmithlawoffice.com

Leonard A. Bennett (Admitted *Pro Hac Vice*)
CONSUMER LITIGATION ASSOCIATES, P.C.
763 J. Clyde Morris Boulevard, Suite 1-A
Newport News, Virginia  23601
Telephone:  (757) 930-3660
Facsimile:  (757) 930-3662
Email:  lenbennett@clalegal.com

Ryan T. Earl (Idaho Bar #8342)
EARL & EARL, PLLC
212 10th Avenue South
Nampa, Idaho 83651
Telephone: (208) 890-0355
Facsimile: (208) 461-9560
Email: ryantearlattorneyatlaw@yahoo.com

Attorneys for Plaintiff

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF IDAHO**

| | |
|---|---|
| **JOSE LUIS CALDERON**, ) | |
| ) | CASE NO.: 1:11-CV-00386-EJL |
| Plaintiff, ) | |
| ) | JUDGE LODGE |
| v. ) | |
| ) | |
| **EXPERIAN INFORMATION** ) | |
| **SOLUTIONS, INC.,** ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S**
**_SECOND_ MOTION TO COMPEL DISCOVERY AND FOR RULE 37(c)(1) SANCTIONS**

**I.     INTRODUCTION.**

This is a case brought pursuant to the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq.*, for the repeated refusal of Defendant, Experian Information Solutions, Inc., to delete false and highly derogatory information from the credit report of Plaintiff, Jose Luis Calderon, despite his numerous requests for same.

"The FCRA evinces Congress's intent that consumer reporting agencies, having the opportunity to reap profits through the collection and dissemination of credit information, bear 'grave responsibilities,' 15 U.S.C. § 1681(a)(4), to ensure the accuracy of that information." *Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3rd Cir. 1997). *See also Philbin v. Trans Union Corporation*, 101 F.3d 957, 963 (3rd Cir. 1996); *Millstone v. O'Hanlon Reports, Inc.*, 528 F.2d 829, 833 (8th Cir. 1976).[1] In what Plaintiff believes to be a calculated effort to obfuscate a consumer's ability to truly discover the extent to which Experian does – or, more likely, *does not* – fulfill these grave responsibilities, Experian has chosen to forward consumer disputes to its National Consumer Assistance Center ("NCAC") in Santiago, Chile, and then robotically refuse to produce any meaningful information here in the United States about that operation.  Absent Court intervention, Experian will continue its unethical efforts to thwart Plaintiff's right to develop evidence in support of his claims.

**II.    EXPERIAN HAS SOUGHT TO OBFUSCATE DISCOVERY THROUGHOUT THIS CASE.**

Experian is playing games with discovery here, and has exhibited a pattern of doing so since this case was commenced.

---

[1] The FCRA provides consumers with two (2) primary claims against credit reporting agencies when inaccurate information has been reported about him or her by the agency.  *See* 15 U.S.C. § 1681*e*(b) and § 1681*i*.  Plaintiff has stated both such claims here.

### A.     Experian's Rule 26(a)(1) Initial Disclosures Were Blatantly Deficient.

On November 29, 2011, Experian served a two-page Initial Disclosure pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure. This disclosure identified two (2) stock witnesses – witnesses that Experian identifies in most every case in which it is sued by a consumer under the FCRA – and virtually nothing else. While a spattering a vague documents was referenced in the Initial Disclosures, not a single document was actually produced.

Notably, despite the fact that Experian opened its second NCAC, this one in Santiago, Chile ("NCAC - Chile") sometime in 2007, *see* Deposition of Teresa Iwanski ("Iwanski Depo." relevant excerpts of which are attached hereto as Exhibit 1) at 76, Experian made absolutely no mention of either its existence or its *exclusive* role in the handling of Plaintiff's disputes.

### B.     Experian's Deliberately Evasive Discovery Responses Necessitated a Previous Motion to Compel.

On December 6, 2011, Plaintiff served his First Request for Production of Documents and a corresponding Notice of Rule 30(b)(6) Deposition. In response, Experian produced virtually nothing other than the dispute letters and credit reports he already had in his own possession. Experian's effort to conceal NCAC - Chile continued in these responses. For instance, in response to Plaintiff's original document request seeking "all records of communications between Plaintiff and Experian," Experian made no mention of NCAC - Chile and, instead, represented it had "produced all responsive non-confidential documents in its possession, custody and control as part of its Initial Disclosures in this case." *See* Experian's Response to Request for Production No. 2 (a copy of which is attached hereto as Exhibit 2). Again, not a single document was produced by Experian with its Initial Disclosures.

On February 14, 2012, Plaintiff sent a lengthy letter to Experian outlining the deficiencies in its discovery responses to date. *See* Letter from Sylvia A. Goldsmith dated February 14, 2012 (a copy of which is attached hereto as Exhibit 3). It was only in response to this letter that Experian unveiled the existence of NCAC - Chile. Yet Experian still refused to produce a shred of information from NCAC - Chile. Plaintiff's first Motion to Compel followed.

As the parties were briefing that original Motion to Compel, Plaintiff served additional discovery aimed at information from NCAC - Chile. It was through this discovery that Plaintiff first learned that NCAC - Chile "is generally used to respond to *all* of the mail correspondence received by Experian's National Consumer Assistance Center in Allen, Texas." *See* Experian's Response to Interrogatory No. 3 (a copy of which is attached hereto as Exhibit 4). In other words, it was ***nine (9) months*** into this litigation before Experian confessed what it knew all along, *i.e.*, that Experian's primary location for handling mailed correspondence (like all of Plaintiff's multiple dispute letters here) is located in Santiago, Chile.

During the pendency of the original Motion to Compel, and because substantive information about NCAC - Chile had still not been produced, Plaintiff did an additional meet and confer letter and telephone conference regarding Experian's discovery deficiencies. *See generally* Letter from Sylvia A. Goldsmith dated May 10, 2012 (a copy of which is attached hereto as Exhibit 5).

On June 6, 2012, the parties appeared before this Honorable Court and argued Plaintiff's Motion to Compel. The hearing resulted in the Court's Order on Plaintiff's Motion to Compel which was entered on June 18, 2012. *See* Order on Plaintiff's Motion to Compel, Document 25.

**C.     Experian Is Still Deliberately Withholding Discovery From Plaintiff.**

On June 22, 2012, Experian served its supplemental discovery responses on Plaintiff. The only documentary supplementation of substance was the internal file information relating to Plaintiff's father, Jose C. Calderon (which the Court specifically ordered Experian to produce), and a 3-page document titled Experian Intracompany Services Agreement between Experian Services Chile, S.A., and Experian Information Solutions, Inc. and Experian Service Corp. Absolutely nothing else relating to NCAC - Chile was produced.

On July 2, 2012, Plaintiff served his Amended Notice of Rule 30(b)(6) Deposition. This Amended Notice carefully outlined the particular topics on which Plaintiff still had not been given any information, as well as requesting testimony on matters including those contained in the minimal supplementation Plaintiff had received. Plaintiff included an entire section dedicated to NCAC - Chile specifically including the following topics:

**[NCAC in Santiago, Chile]**

> 4.     Please identify, authenticate, describe and explain with specificity any contract(s), agreement(s), or other written understanding(s) by and between any Experian entities that controls, governs, describes or outlines any facet of the operation of the NCAC in Santiago, Chile. This Subject specifically includes, but is not limited to, any and all information surrounding the negotiation of, specific terms, and the actual costs referred to in the Experian Intracompany Services Agreement produced in this litigation, Bates No. EXP/CALDERON 001312.

> 5.     Please identify, authenticate, describe and explain with specificity any cost or payment arrangement(s) by and between any Experian entities for reinvestigations done by the NCAC in Santiago, Chile, for Defendant. This Subject specifically seeks, but is not limited to, information about the NCAC in Santiago, Chile, is directly or indirectly compensated for reinvestigations it performs on Defendant's behalf, and/or how the costs of conducting such reinvestigations are paid, and by whom.

> 6.     Please identify, authenticate, describe and explain with specificity the process through which it was decided by and between any Experian entities, including any cost benefit analysis, to open a second NCAC. Without limiting this Subject in any way and to the extent you considered alternate locations for such NCAC, this Subject seeks information about the process through which it was decided that the second NCAC would be located in Santiago, Chile.

*See* Amended Notice of Rule 30(b)(6) Deposition (a copy of which is attached hereto as Exhibit 6). Experian designated Senior Director of Accounting and Reporting, Scott Yamanaka, to testify on Subject Nos. 4 and 5 of Plaintiff's Amended Notice. *See* Experian's Responses and Objections to Plaintiff's [Amended] Notice of Rule 30(b)(6) Video Deposition at 5-6 (a copy of which is attached hereto as Exhibit 7).[2]

Mr. Yamanaka testified he has virtually no information on the two (2) Subjects of Examination on which he was designated. He conceded that other than being provided the Experian Intracompany Services Agreement by counsel in specific preparation for his deposition, he had never seen it before because he has no reason to review such a thing in his position at Experian Services Corp. *See* Deposition of Scott Yamanaka ("Yamanaka Depo." relevant excerpts of which are attached hereto as Exhibit 9) at 57-58. He certainly played no role in negotiating or otherwise outlining the relationship between Experian and its Chilean counterpart, and has no information about those matters. *See* Yamanaka Depo. at 55.

By putting Mr. Yamanaka forth as Experian's mouthpiece, Experian deliberately manipulated its Rule 30(b)(6) designation obligation so as to limit discovery not to what Plaintiff had requested but to that which Experian wants to share:

> Q. You, as part of your job, wouldn't have any reason to have any knowledge what documents govern the relationship between these two entities with respect to NCAC specifically, right?
> A. Right. So, basically, where I come in in that is how the actual costs are invoiced and paid between entities.
>
> Q. Well, have you had an opportunity to learn in preparation for this deposition as the designee what written documents, emails, contracts, procedures would constitute the written understanding of the relationship between Experian Information, Experian Chile with respect to specifically NCAC?

---

[2] With Experian's Responses and Objections being served just two days before the Rule 30(b)(6) Depositions were set to commence, Plaintiff was forced to expend time and resources attempting to resolve the outstanding discovery problems caused by Experian in advance of the depositions scheduled for July 26, 2012 and August 2, 2012. *See* Letter from Sylvia A. Goldsmith dated July 24, 2012 (a copy of which is attached hereto as Exhibit 8). The parties had a number of communications by telephone and email on same, and the depositions proceeded as scheduled.

> A. It would be the Intracompany Services Agreement that we've been talking about.
>
> Q. Okay, that's one. You worked for a lot of corporations. *** You're not representing to me your belief that that three-page document, really just an outline, constitutes the entire written understanding between these two entities with respect to how NCAC Chile is supposed to operate, are you?
> A. I don't have any direct knowledge of any written agreements outside of this.
>
> Q. That's you personally, right?
> A. Correct.
>
> Q. You're not saying that Experian Information has no such documents, are you, you just don't know?
> A. That's correct.

*See* Yamanaka Depo. at 59-60.[3]

Interestingly, Mr. Yamanaka's testimony did clarify that there is *significant* documentation that has not been produced by Experian here. For example, Interrogatory No. 4 (in connection with Document Request No. 23) requests information about "payments made to Experian Services Chile, S.A." for work performed for Experian Information Solutions, Inc.[4] Mr. Yamanaka described at length various invoices, spreadsheets, and system reports with "drill down capabilities" that show in specific detail the costs associated with NCAC - Chile:

> Q. And so all of the costs that Experian Chile is Cost Centering back to Experian Information regarding the data operations would be included within that one line, that amount under "Data," correct?
> A. Yes.
>
> Q. Then if you wanted to determine how that number was derived, that is, to get the breakdown for that number, how would you do that?
> A. You would look into System Reports that show the detail, and there's drill-down capabilities to figure out how that was derived.

---

[3] Mr. Yamanaka agreed that there "must be other documents by which Experian Information directs the activity of Experian Chile[,]" going on to provide vague testimony about "communications" and "some emails[.]" *See* Yamanaka Depo. at 58. None of this has been produced to Plaintiff.

[4] Interrogatory No. 4 states "Please describe any and all the payments made to Experian Services Chile, S.A. for work done by Experian Services Chile, S.A., on any consumer dispute made by Plaintiff to Experian Information Solutions, Inc." with Request for Production No. 23 requesting Experian to produce any and all documents used to answer any interrogatory.

7

*See* Yamanaka Depo. at 44-45. *See also* Yamanaka Depo. at 16-17, 21, 25-26. Absolutely none of this information has previously been produced or ***even mentioned to Plaintiff*** in response to his discovery requests specifically on point.

Likewise, Document Request No. 15 states "[p]lease produce all cost/benefit analyses regarding expenditures necessary for compliance with 15 U.S.C. § 1681*i* or the reinvestigation of disputed credit information." Experian's initial response to this Document Request was that it would require Experian to "create documents that do not exist." *See* Exhibit 2 at Response to Request for Production No. 15. In its Supplemental Response to Request for Production No. 15, Experian went even further with its deception: "Experian Information Solutions, Inc. and Experian Services Chile, S.A. do not maintain an analysis of the cost of reinvestigations of consumer disputes." *See* Experian's Supplemental Response to Request for Production No. 15 (a copy of which is attached hereto as Exhibit 10). But Mr. Yamanaka flatly refuted this representation:

> Q. You would expect [Experian] would do a thorough job to do a cost benefit analysis to determine whether or not to open an Experian Chile NCAC versus keep it in Texas, right?
> A. Yes, there would have been a financial analysis that was performed.
>
> Q. Now, have you, yourself, had an opportunity to review or examine such things?
> A. No.
>
> Q. *** You didn't review any such thing in preparation for this deposition, right?
> A. No.

*See* Yamanaka Depo. at 64.

Finally, Plaintiff specifically requested anything related to incentives paid to Experian's reinvestigation agents.[5] Experian initially produced nothing other than objections on

---

[5] Plaintiff's Document Request No. 13 states in its entirety: "Please produce documentation of all programs under which Defendant's employees or agents who communicate with consumers or handle any aspect of consumer disputes are provided any bonus, pay or other incentive."

this issue, but *after* this Court's Order on Plaintiff's Motion to Compel, Experian provided the following supplementation:

> Experian Services Chile, S.A. did not have any incentive plans that directly or indirectly rewarded efficiency over accuracy during the time period of Plaintiff's disputes.

*See* Exhibit 10 at Experian's Supplemental Response to Request for Production No. 13.  But through a lengthy and difficult line of questioning (the answers to which seemed calculated to prevent Plaintiff from discovering the truth),[6] Experian finally conceded that its dispute agents are, in fact, given an "incentive package" which is paid on a quarterly basis and is formulated, at least in part, on "converted units" which assign value to particular tasks done by individuals agents so as to reward high volume of work being processed.  *See* Iwanski Depo. at 72-73.  Mr. Yamanaka confirmed that these bonuses paid to dispute agents in NCAC - Chile are easily seen

---

[6] The following exchange during the deposition of Experian's corporate representative, Teresa Iwanski, who was designated to testify on the matter, shows the game-play going on here:

> Q.  Ms. Iwanski, have you reviewed how any of the agents that handled Mr. Calderon's dispute are paid?
> A.  No ma'am.
>
> Q.  Are you in a position to tell me how their pay has been determined?
> A.  I just don't [have] specific knowledge about their particular pay.
>
> Q.  Okay.  Do you have specific knowledge [about how] agents located in the Santiago NCAC for the time frame of 2008 to 2011 were compensated?
> A.  I just know it to be different as far as the U.S. employees beyond that I don't have specific information about their pay.
>
>> MS. GOLDSMITH:  I'm not seeing that this witness has any sort of specific knowledge about the people that handled my client's disputes for the relevant period of time and how they were compensated.
>> MS. TAYLOR:   I still believe that you're asking the questions incorrectly.
>
> * * *
>
> Q.  Okay. Ms. Iwanski here's what my struggle is.  This is not a semantics test okay?  And I struggle with the fact that it's being represented to me that unless I ask a question "the right way," that I'm not entitled to the information and *** that's a complicated process for me because you have information that I need and I'm not [in] a position to ask my questions any other way if I don't know what information I'm supposed to be asking for …

*See* Iwanski Depo. at 62-63, 65.  Only when called on the carpet did Experian then provide genuine answers.

on the financial spreadsheets his department prepares. *See* Yamanaka Depo. at 49. Again, absolutely none of this has been produced by Experian.

### III. EXPERIAN FLATLY REFUSES TO PRODUCE *ANY* ADDITIONAL INFORMATION ABOUT NCAC - CHILE.

It is undisputed that Plaintiff's Experian credit report included a public record judgment that belonged to somebody else.[7] It is likewise undisputed that despite Mr. Calderon's thirteen (13) separate and distinct disputes, Experian refused to delete the false and highly derogatory judgment until the instant lawsuit was filed. What remains in dispute is whether Experian's conduct (or lack thereof) in that regard constitutes a negligent and/or willful violation of the FCRA. So Experian is doing everything it can to prevent Plaintiff from discovering the necessary information to prove those claims.

#### A. Experian Must Me Ordered (Again) to Produce The Individual Dispute Agents for Deposition.

Plaintiff has sought all information surrounding what Experian did (or did not do) with respect to the multiple times Plaintiff disputed the subject public record judgment. *See* First Request for Production of Documents Directed to Experian Information Solutions, Inc. at Request Nos. 1, 2, 3, 5, 6 and 7 (a copy of which is attached hereto as Exhibit 11); Exhibit 6 at Subject Nos. 1, 15, 16, 17, 18 and 19. Experian has produced written materials including the correspondence by and between the parties,[8] two (2) Consumer Dispute Verification forms,[9] a

---

[7] It is undisputed that Plaintiff's credit report also included an NCO collection tradeline that belonged to somebody else and that was deleted by Experian upon Plaintiff's initial dispute request. That NCO tradeline was deleted because even though it carried the same first name, last name and address as Plaintiff, the furnisher confirmed it had a different Social Security number.
[8] This documentation consists of Plaintiff's dispute letters and supporting documentation, and communications from Experian in response, specifically including copies of Plaintiff's credit disclosure.
[9] A Consumer Dispute Verification Form is the form sent by Experian to the furnisher of disputed information on which that furnisher can provide information to Experian about the account or information.

Disclosure Log,[10] and two (2) Dispute Resolution Logs.[11] Experian also offered Teresa Iwanski, Senior Legal and Compliance Specialist, as its corporate designee to testify as to Plaintiff's dispute-related questions.

However, Ms. Iwanski testified to little more than her interpretation of what the individual dispute agents handling Plaintiff's numerous disputes ***should have done*** based on the training they ***should have received***:

> Q. [W]ould you expect the agent to go into the CAPS system and look at the D/R log information?
> A. Yes, that's what they're trained to do.
>
> Q. Do you know if the particular agent in this instance did that?
> A. Since I was not standing next to the agent that actually processed the piece of mail, I can't – I can't tell you whether or not the agent did that, but I can tell you that that's what they're trained to do.

*See* Iwanski Depo. at 172-173. Perhaps Experian will argue that its reinvestigation process is so black-and-white that it is reasonable to have a trained witness come in and play Monday-morning quarterback for purposes of explaining what was done here. But Ms. Iwanski made clear that, in reality, the standard training provides nothing more than ***examples*** of possible situations; the actions of individual dispute agents necessarily depends on what they reviewed, valued and considered on their own in any given instance:

> Q. What do you expect your agents to do with information from a consumer that says, I've talked to the furnisher, I've talked to the court clerk and I understand this – this account has my name on it, but it's somebody else with the same name; what do you expect them to do in that situation?
> A. Well, it depends on the specific information that's being conveyed at that time.

*See* Iwanski Depo. at 189.

> It all depends on what's being alleged at that time. Just this – the – the fact that – the verbiage itself in here is just an example. *** [T]his bullet is not going to explain the

---

[10] Each time a consumer contacts Experian either to request a report or to initiate an investigation, the information is logged by Experian in what is called a Disclosure Log.
[11] A Dispute Resolution Log ("D/R Log") is a log that provides a snapshot of a consumer's disputes and Experian's response to same.

> entirety of what the agent would be looking at, it would just give an example or a portion of it.

*See* Iwanski Depo. at 190.

> [E]ach file and how it's analyzed is going to be looked at and there's just so many different instances where that might be a little be different in – in the relation as far as analyzing as a mixed file.

*See* Iwanski Depo. at 195.

Based on the foregoing, Plaintiff advised Experian that it was necessary to proceed with the depositions of three (3) of the individual dispute agents located in NCAC - Chile since they conducted the reinvestigations that are most at issue here; it is these agents that hold the information as to whether those reinvestigations meet the standards required by the FCRA.[12]  *See* Exhibit 8.  *See also* Letter from Sylvia A. Goldsmith dated August 3, 2012 (a copy

---

[12] A consumer's right to dispute the accuracy or completeness of any item of information in his credit file is one of the most critical protections provided by the FCRA.  *See* 15 U.S.C. § 1681*i*.  The legislative history characterizes this dispute and correction process as "the heart of … efforts to ensure the ultimate accuracy of consumer reports" which is necessary for the ongoing integrity of our nation's banking system.  *See* Committee Report accompanying S.650, S. Rep. No. 185, 104th Congr. 1st Sess., at 43 (Dec. 14, 1995).  *See also* 15 U.S.C. § 1681(a)(1) ("The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.").

"Under 15 U.S.C. § 1681*i*(a)(1)(A), credit reporting agencies must promptly reinvestigate any information in a consumer's file that is disputed by a consumer[.]"  *Cortez v. Trans Union, LLC*, 617 F.3d 688, 712 (3rd Cir. 2010). A reinvestigation must be "a good faith effort to determine the accuracy of the dispute item or items."  *See* FTC Official Staff Commentary § 611 item 2.

It is generally understood that "[t]he 'grave responsibilit[y]' imposed by § 1681*i*(a) must consist of something more than merely parroting information received from other sources.  Therefore, a 'reinvestigation' that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute."  *Cushman*, *supra*, 115 F.3d at 225.  *See also Apodaca v. Discover Financial Serv.*, 417 F.Supp.2d 1220, 1231 (D. N.M. 2006) ("'[I]t would make little sense to conclude that, in creating a system intended to give consumers a means to dispute – and, ultimately, correct – inaccurate information on their credit reports, Congress used the term 'investigation' to include only superficial … inquiries by creditors' that 'do not look beyond the automated information' in their own computer systems and 'never consult underlying documents such as account applications' and the like.").

Thus, the CRA must review and consider the information provided to it by the consumer, *see* 15 U.S.C. § 1681*i*(a)(4), forward all relevant information to the furnisher of the disputed information, *see* 15 U.S.C. § 1681*i*(a)(2), and conduct its own "reasonable reinvestigation" to determine the accuracy or completeness of its reporting.  *See* 15 U.S.C. § 1681*i*(a)(1)(A).  Even then, a CRA's "exclusive reliance" on furnishers of credit information or similar standardized procedures "may not be justified once the credit reporting agency receives notice that the consumer disputes information contained in his [or her] credit report."  *Apodaca*, *supra*, 417 F.Supp.2d at 1230-1231.

of which is attached hereto as Exhibit 12). Experian has refused to produce these witnesses.[13] *See* Letter from Angela Taylor dated July 31, 2012 (a copy of which is attached hereto as Exhibit 13) (arguing that only way for "litigants from the United States to take deposition testimony on Chilean soil" is to go through the letter rogatory process).

As a preliminary matter, Experian's justification for refusing to produce these fact witnesses is misplaced. Experian's counsel represented to this Court in the original Motion to Compel hearing that it is "against Chilean law" for the individual dispute agents to be deposed by Plaintiff. Chile is, in fact, one of the in the world not party to the Hague Convention which would allow a subpoena to be issued for the individual dispute agents' appearance.[14] However, since this Court has already found that the relationship between Experian and its sister corporation "is sufficiently close to treat them as the same for purposes of the present discovery disputes[,]" *see* Order on Plaintiff's Motion to Compel, Document 25 at 4, there is no need for Plaintiff to issue a subpoena for the agents' appearances.[15] Experian's "against Chilean law" defense is simply a red herring.

Moreover, if Experian was truly concerned about a purported (albeit undefined) Chilean law that allegedly prohibits Experian from voluntarily producing its employees/agents to appear for deposition "on Chilean soil," then Experian could either bring the agents to their

---

[13] While Experian desires to force Plaintiff to accept the generalized assumptions of a well-prepped corporate designee who concedes her only knowledge of what the particular agents did or did not do with respect to Mr. Calderon's disputes rests entirely on what they were *supposed* to do, it ultimately concedes that Plaintiff is allowed to proceed with the depositions if he so chooses.

[14] In order for Plaintiff to command these agents to appear, he would be required to commence the "letter rogatory" process which, according to Plaintiff's research, will take approximately one (1) year and nearly $7000 in upfront costs. Plaintiff would still be required to hire Chilean counsel to conduct the actual deposition at additional cost and risk.

[15] Mr. Yamanaka's testimony underscored the fact that Experian Services Chile, S.A. is, in actuality, operated at the complete control and discretion of the instant Experian defendant. *See*, *e.g.*, Yamanaka Depo. at 24, 30-32, 44-45. It is not credible for Experian to argue that it is not in a position to produce the specific agents who handled Plaintiff's disputes for deposition.

Allen, Texas NCAC for deposition[16] or, to save on cost, arrange for the individuals to appear at the United States embassy in Santiago, as such location is U.S. soil. *See* Exhibit 12 at Page Two. Experian scoffed at Plaintiff's suggestions in this regard, reiterating the same old "against Chilean law" rationale. *See* Letter from Angela Taylor dated August 8, 2012 (a copy of which is attached hereto as Exhibit 14).

Without the testimony of the individual agents, it is speculative at best what was actually done on the thirteen (13) occasions when Experian refused to remove the false and highly derogatory judgment from Plaintiff's credit report. Ms. Iwanski's deposition goes a long way toward establishing negligence under 15 U.S.C. § 1681*i*. *See*, *e.g.*, Iwanski Depo. at 168-171 (on twelve subsequent disputes, Experian did nothing more than look to see that the information "had been previously verified" by the furnisher of information).[17] But this is assuming that Ms. Iwanski's testimony (and the documents upon which she relies) is even admissible. *See* Fed. Rules of Evid. 801(c) and 803(6).[18]

Pursuant to Rule 37(c), a party has an affirmative duty to disclose and/or supplement information consistent with the liberal discovery spirit of Rule 26:

(c) FAILURE TO DISCLOSE, TO SUPPLEMENT AN EARLIER RESPONSE, OR TO ADMIT.

(1) *Failure to Disclose or Supplement.* If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was

---

[16] Experian employees from the Allen, Texas NCAC routinely visit the Santiago, Chile NCAC and vice versa thereby undercutting any argument of undue burden or expense on the part of Experian. *See*, *e.g.*, Iwanski Depo. at 80, 82, 85, 86.

[17] Experian's *repeated* refusal to delete information that it now concedes never belonged to Mr. Calderon is, in and of itself, evidence that any alleged "reinvestigations" were negligent as a matter of law. Additionally, Experian has never even attempted to respond to the allegations that its failure to make a determination that Plaintiff's subsequent disputes were "frivolous or irrelevant" and provide notice of same to Plaintiff are *per se* violations of 15 U.S.C. § 1681*i*(a)(3).

[18] To satisfy the business record exception under Rule 803(6), Experian would need to establish all of the enumerated elements, specifically including: "(E) neither the source of information nor the method or circumstances of preparation indicate a lack of trustworthiness." The sheer vigor with which Experian is trying to make sure Plaintiff never learns anything substantive about the operation in Chile calls into question the "trustworthiness" of any alleged business records generated from that operation.

> substantially justified or is harmless. In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard:
>
>> (A) may order payment of the reasonable expenses, including attorney's fees, caused by the failure;
>>
>> (B) may inform the jury of the party's failure; and
>>
>> (C) may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)–(vi).

*See* F.R.C.P. 37(c)(1). This rule is not permissive in its language; it is automatic: "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial." In addition, the Court may order sanctions accordingly, ranging from ordering Experian to pay Plaintiff's reasonable expenses and attorneys' fees in pursuing the instant motion, to "prohibiting the disobedient party from supporting or opposing designated claims or defenses" and "staying further proceedings until the order is obeyed[.]" *See* F.R.C.P. 37(b)(2)(A)(ii) and (iv).

    Here, Experian has flatly refused to produce the individual dispute agents from Chile in violation of this Court's Order on Plaintiff's Motion to Compel. Plaintiff respectfully asks that all further proceedings be stayed until Experian has done so or, in the alternative, estop Experian from putting on any defense that the reinvestigations in Chile were reasonable.

  **B.**  <u>**Experian Must Produce Information Relevant to Plaintiff's Claim That It Willfully Violated the FCRA or Be Estopped From Defending Such Claim.**</u>

    Per the Supreme Court's ruling in *Safeco Ins. Co. v. Burr*, 551 U.S. 47, 127 S.Ct. 2201 (2007), the standard for willful violations of the FCRA includes not only knowing or intentional violations of a standard, but also violations in reckless disregard of the law. The High Court established an objective standard of recklessness in civil cases generally, defining it as "action entailing 'an unjustifiably high risk of harm that is either known or so obvious that it

should be known.'" *Safeco*, *supra*, 551 U.S. at 68, 127 S.Ct. at 2215. "Thus, a company subject to [the] FCRA does not act in reckless disregard of it unless the action is not only a violation under a reasonable reading of the statute's terms, but shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Id.*, 551 U.S. at 69.[19]

Based on this standard, Plaintiff first and foremost requested from Experian "any legal interpretations on which Experian intends to rely as a defense to any claim in the instant case. For each such interpretation(s), please identify, authenticate, describe and explain with specificity how it was determined that such interpretation would be relied upon here." *See* Exhibit 4 at Subject No. 29. Experian refuses to provide anything other than an objection in response. *See* Exhibit 7 at Response to Subject No. 29.

Plaintiff counsel properly cautioned Experian: "Experian made specific decisions as to what policies and procedures it would adopt, and if Experian intends to argue *here* that any of those decisions were based on a legal reading or interpretation of the [FCRA], then Plaintiff unequivocally is entitled to discover not only what those readings or interpretations were, but also who made the decision(s) to rely on them and how that reliance impacted the ultimate decision(s) that was made." *See* Exhibit 8 at Page Two-Three. But Experian steadfastly refuses to provide *any* substantive response.

As discussed at more length *supra*, Experian is prohibited from keeping responsive information from Plaintiff now and then trying to pull out some hidden reliance later to shield itself from a willfulness determination. Pursuant to Rule 37(c)(1), Plaintiff respectfully

---

[19] Of specific significance here, the Supreme Court cautioned that the *Safeco* case – a case unlike this one which involved an insurance company and its obligation to send adverse action notices under 15 U.S.C. § 1681*m*(a) – did not involve facts where "the business subject to the Act had the benefit of guidance from the courts of appeals or the Federal Trade Commission (FTC) that might have warned it away from the view it took." *Safeco*, *supra*, 551 U.S. at 70, 127 S.Ct. at 2216.

asks this Court to enter an Order prohibiting Experian from putting on any defense that it relied on any statutory reading or interpretation in adopting the policies and procedures it has.

With the foregoing *Safeco* issue off the table, the willfulness determination turns on Experian's reckless disregard of the law. In this respect, Experian has been equally evasive. For instance, Plaintiff has sought information ranging from incentive programs to cost/benefit analyses with respect to conducting reinvestigations. *See*, *e.g.*, Exhibit 10 at Request Nos. 13, 15, 16. At the original Motion to Compel hearing, Experian represented that Experian had no such information; the Court acknowledged as much in its Order on Plaintiff's Motion to Compel. *See* Order on Plaintiff's Motion to Compel, Document 25 at 7. However, as Plaintiff has shown through the deposition testimony of Experian's two Rule 30(b)(6) designees, Experian's representation to the Court on both fronts is *false*. *See* Section II, C *supra*.

Likewise, Plaintiff has sought discovery related to how it was decided by Experian to open a second NCAC, and specifically to do so in Santiago, Chile, as this information goes to Experian's motives in adopting the policies and procedures it has. *See* Exhibit 6 at Subject No. 6.[20] In response to Experian's steadfast refusals to produce a witness (or any other materials) on this Subject, Plaintiff identified and requested to depose four (4) individuals: Tony Reeves (the signator on behalf of Experian Services Chile, S.A. to the Experian Intracompany Services Agreement), Lee Lundy (Senior VP of NCAC), Steven Wagner and Kerry Williams (both of whom were active in the set-up and supervision of the Chilean

---

[20] As quoted above, Subject No. 6 states in its entirety:

Please identify, authenticate, describe and explain with specificity the process through which it was decided by and between any Experian entities, including any cost benefit analysis, to open a second NCAC. Without limiting this Subject in any way and to the extent you considered alternate locations for such NCAC, this Subject seeks information about the process through which it was decided that the second NCAC would be located in Santiago, Chile."

operation.  *See*, *e.g.*, Email from Len Bennett dated August 1, 2012 (a copy of which is attached hereto as Exhibit 15; Exhibit 11 at Page Three.  Again, Experian has flatly refused.

    The instant lawsuit irrefutably involves a *United States* resident with claims stemming from his *United States* credit report issued by a *United States* company subject to a *United States* federal law.  But Experian has chosen to isolate the primary witnesses in this case – actually, in *any* reinvestigation case – in Chile so that arguably no United States litigant could ever realistically depose them, and continues to conceal *any* information about this choice.  This kind of manipulation smacks of the "perverse incentives" courts have warned about in other FCRA cases when discussing the need for punitive damages:

> [R]equiring FCRA plaintiffs to prove the defendant actually knew that it was violating the law would "create perverse incentives" for credit reporting agencies to pursue a policy of deliberate ignorance of the law in order to avoid liability for punitive damages.  Under such a policy, a credit-reporting agency could make the economic calculation that it is less expensive to simply ignore the law, stonewall consumers, and then pay compensatory damages for negligent violations that give rise to litigation, rather than open its eyes and pay the cost of genuinely responding to consumer complaints by conducting a more diligent investigation of disputed credit information in advance of litigation.  I believe Congress intended the FCRA's punitive-damages provision to increase the economic risk entailed by such a policy and thereby dissuade credit-reporting agencies from pursuing it.

*See Apodaca*, *supra*, 417 F.Supp.2d at 1228 (quoting *Reynolds v. Hartford Financial Serv. Group, Inc.*, 435 F.3d 1081, 1099 (9th Cir. 2006).  *See also Cushman*, *supra*, 115 F.3d at 227.

    If Experian intends to say even *once* that its conduct here was not willful, then Plaintiff has to be allowed to take the necessary discovery to prove otherwise.  But Experian has refused to allow Plaintiff to do so.  Therefore, Plaintiff respectfully asks that all further proceedings be stayed until Experian has produced the necessary witnesses to testify on those topics (and produce any correlating documentation) or, in the alternative, estop Experian from putting on any defense as to willfulness whatsoever.

## **CONCLUSION**

Experian has responded to its discovery obligations as a complete joke, laughing off any responsibility to produce anything (or anyone) that may be harmful to its defense. Plaintiff has a right to develop his allegations into evidence for use at trial. If Experian wishes to continue to obstruct Plaintiff's ability to do so, then this Court should sanction Experian accordingly as outlined in detail herein.

Respectfully submitted,


 /s/ Sylvia A. Goldsmith
Sylvia A. Goldsmith (Admitted *Pro Hac Vice*)
Geoff B. McCarrell, Esq.
LAW OFFICE OF SYLVIA A. GOLDSMITH
Milano Law Building
2639 Wooster Road
Rocky River, Ohio  44116
Telephone:  (440) 934-3025
Facsimile:  (440) 934-3026
Email: sgoldsmith@sgoldsmithlawoffice.com
Email: gmccarrell@sgoldsmithlawoffice.com

Leonard A. Bennett (Admitted *Pro Hac Vice*)
CONSUMER LITIGATION ASSOCIATES, P.C.
763 J. Clyde Morris Boulevard, Suite 1-A
Newport News, Virginia  23601
Telephone:  (757) 930-3660
Facsimile:  (757) 930-3662
Email:  lenbennett@clalegal.com

Ryan T. Earl (Idaho Bar #8342)
EARL & EARL, PLLC
212 10th Avenue South
Nampa, Idaho 83651
Telephone: (208) 890-0355
Facsimile: (208) 461-9560
Email: ryantearlattorneyatlaw@yahoo.com

Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and accurate copy of the foregoing **Memorandum in Support of Plaintiff's *Second* Motion to Compel Discovery and for Rule 37(c)(1) Sanctions** was served on the 23rd day of August, 2012, by the means indicated below, on the following counsel of record:

*By Electronic Mail Delivery*:

Jason E. Prince, Esq.
STOEL RIVES LLP
101 S. Capitol Blvd.
Boise, ID 83702
Tel.: (208) 387-4288
Fax: (208) 380-9040

Daniel J. McLoon, Esq. (Admitted *Pro Hac Vice*)
Angela M. Taylor, Esq. (Admitted *Pro Hac Vice*)
JONES DAY
3161 Michelson Drive, Suite 800
Irvine, CA 92612.4408
Telephone: (949) 851-3939
Facsimile: (949) 553-7539

    /s/ Sylvia A. Goldsmith
Sylvia A. Goldsmith (Admitted *Pro Hac Vice*)
LAW OFFICE OF SYLVIA A. GOLDSMITH
Attorney for Plaintiff