**CERTIFIED COPY**

UNITED STATES DISTRICT COURT

DISTRICT OF IDAHO

| | | |
|---|---|---|
| JOSE LUIS CALDERON | X | Case No: 1:11-cv-00386-EJL |
| | X | |
| VS. | X | |
| | X | |
| EXPERIAN INFORMATION | X | |
| SOLUTIONS, INC. | X | |

ORAL DEPOSITION OF

TERESA IWANSKI

July 26, 2012


ORAL DEPOSITION OF TERESA IWANSKI, produced as a witness at the instance of the Plaintiff, and duly sworn, was taken in the above-styled and above-numbered cause on the 26th day of July, 2012, from 9:05 a.m. to 6:18 p.m., before Laura D. Glenn, CSR in and for the State of Texas, reported by machine shorthand, at the law offices of Jones Day, 2727 Harwood Road, Fifth Floor, located in the city of Dallas, state of Texas, pursuant to the Rules of Civil Procedure and the provisions stated on the record.



MAXENE WEINBERG AGENCY
Litigation Support From Opening to Verdict
800-640-1949 | www.mwadepos.net

1  system.
2           Did I misunderstand that?
3  A.  Yes.  I -- I did not say that.
4  Q.  Okay.  Where are the CDVs kept?
5  A.  If we're talking about just CDVs, those are -- they
6  can be imaged and kept in NIS.
7  Q.  What about ACDVs?
8  A.  If the ACDV is -- is kept -- if it's not in NIS,
9  it's in -- and I don't know the -- the -- how that would work,
10 but it's retrievable also through Mainframe.
11 Q.  Okay.  Now, of the agents -- well, strike that.
12          How many individuals work at the NCAC in Allen,
13 Texas; do you know?
14 A.  I don't know the exact count on how many individuals
15 work there.
16 Q.  Do you know how many consumer assistance agents --
17 I'm sorry -- consumer dispute agents work at the Allen, Texas
18 NCAC?
19 A.  And I don't know if this is a current count, but --
20 but I believe it to be right around 150.
21 Q.  Do you know if that number has changed over time?
22          MS. TAYLOR:  Object to the form.  Calls for
23 speculation.
24 A.  As far as changing, it's quite possibly changed.  I
25 don't know, I don't monitor that kind of information.

Page 41

```
1      Q.   Have you ever been to the NCAC in Santiago, Chile?
2      A.   I have not.
3      Q.   Do you know anyone who works in the NCAC in Allen,
4  Texas that has been to the NCAC in Santiago, Chile?
5      A.   Yes, ma'am.
6      Q.   And my question was a little bit unclear.  My
7  question asked do you know anyone.
8           Can you identify for me the individuals,
9  whether by name or by position, that have been to the NCAC in
10 Santiago, Chile?
11     A.   Experian's training department would have traveled
12 to Chile, along with the subject matter expert from possibly a
13 dispute department or a quality department to assist in
14 training the Santiago agents.
15     Q.   Okay.  You threw out a whole lot of words there, so
16 let me back up for a second.  Now, you've mentioned the
17 Experian training department.
18          Is that another department that's located in
19 the same building as the NCAC?
20     A.   I apologize.  Yes, it is.
21     Q.   Okay.  But it's not a department of the NCAC,
22 correct?
23     A.   In remembering what divisions and departments and
24 such were part of NCAC, I believe the training department to
25 be part of it.  It's just not something that I was thinking of
```

Page 80

```
 1    earlier.
 2         Q.   Okay.  So in your best estimate of the number of
 3    individuals that work in the NCAC, were you including people
 4    that work in the training department?
 5         A.   Yes, I was.
 6         Q.   Okay.  Do you know how many people work in the
 7    training department?
 8         A.   I believe it to be three, over time, possibly four.
 9         Q.   Okay.  And you said three over time, meaning at any
10    given time in the last five years, let's say, there might have
11    been three positions, there might have been four?
12         A.   Yes, ma'am.
13         Q.   Okay.  As of today, do you know who is in charge of
14    the training department?
15         A.   Yes, ma'am.
16         Q.   Who is that, please?
17         A.   Lori Ellington.
18         Q.   And what is Ms. Ellington's position?
19         A.   I'm not exactly sure.  I know that she's a division
20    of communications.  Beyond that, I just don't know her title.
21         Q.   Okay.  And of the other three -- two or three
22    people, do you know what their positions are?
23         A.   I just know them to be trainers.
24         Q.   Okay.  Now, you indicated that it was your
25    understanding that the training department -- God bless you --
```

Page 81

1    would have visited the NCAC in Santiago.

2             Let's start with, do you know how many times
3    the training department would have visited Santiago, Chile?

4             MS. TAYLOR:  I'm going to object as vague as to
5    time.

6        A.   Since the opening of the center, it would be several
7    times.  I'm not exactly sure how many, though.

8        Q.   (BY MS. GOLDSMITH)  Okay.  So we've indicated it
9    opened roughly in 2007, correct?

10       A.   Yes, ma'am.

11       Q.   When you say that the training department visited
12   Santiago, Chile, let's start with, would it have been all of
13   the individuals in the training department at any given time?

14            MS. TAYLOR:  Object to the form.

15       A.   I'm not sure if initially there was travel that
16   included all of them.  I -- I do know it to possibly be one at
17   a time at a later point, but I'm not quite sure if they all
18   went at another time that I'm just not aware of.

19       Q.   (BY MS. GOLDSMITH)  Okay.  Do you know if, at any
20   point since the NCAC in Santiago, Chile was opened that the
21   entire training department went?

22       A.   I just can't remember sitting here today, I don't
23   know.

24       Q.   Okay.  Do you know who was part of the training
25   department in 2007?

Page 82

```
 1        A.    Yes, ma'am.
 2        Q.    Could you give me their names, please?
 3        A.    I'm sorry, just one second.  David Brown.  I'm
 4   sorry, not David Brown.  I'm sorry.  Last name Brown.  I
 5   cannot think of his first name.  I'm sorry.  One second.
 6        Q.    That's okay.  This isn't a test.
 7              MS. TAYLOR:  We're going back five years.
 8        Q.    (BY MS. GOLDSMITH)  Give me your best memory.
 9        A.    I apologize.
10              MS. TAYLOR:  And, again, don't guess.  You
11   know, I'm sure Ms. Goldsmith understands that she's asking you
12   for names from, you know, five years ago.  So to the extent
13   you know, please tell her; if you don't, don't guess.
14        Q.    (BY MS. GOLDSMITH)  Absolutely.
15        A.    I apologize.  David Moore.  I'm just coming up with
16   his last name, Dudley -- it might be his first name.  I'm not
17   quite sure.
18        Q.    These are good brain exercises for you, Ms. Iwanski.
19        A.    Exactly.  And the third would be Terry.  Again,
20   don't know if it's a first name or last name.
21        Q.    Okay.  Now, was Lori Ellington in charge of the
22   training department back in 2007?
23        A.    I -- I am not -- I don't know.
24        Q.    Do you know if she was even part of the training
25   department back in 2007?
```

Page 83

```
 1        A.    I -- she would be part of NCAC.  Whether or not she
 2   was overseeing the training department, I'm just not sure.
 3        Q.    Okay.  Between 2007 and today, could you describe
 4   for me any changes in the employees of the training
 5   department; in other words, if you know of anybody else that
 6   has been part of the training department in the last five
 7   years, could you please let me know?
 8        A.    Up to recent date?
 9        Q.    Yes, please.
10        A.    I believe Dudley is no longer employed.  There is a
11   newer training person -- I'm thinking of her name -- one
12   second.  I'm sorry, I just -- she's very new and I just can't
13   remember her name right now.
14        Q.    That's okay.  And, of course, we have Lori Ellington
15   now, correct?
16        A.    Yes, ma'am.
17        Q.    Can you think of anybody else?
18        A.    Within that training department, that's all I can
19   think of.
20        Q.    Okay.  Do you know if any of the individuals that
21   you could remember that have worked in the training department
22   since 2007, do you know if any of them speak Spanish?
23        A.    I have heard -- I don't know how fluent -- I've
24   heard David Moore speaks Spanish.  I'm not sure how fluent,
25   but I believe at least one.  I'm not entirely sure about the
```

1    others.

2    Q.    Okay.  How about Lori Ellington, do you know if she
3    speaks Spanish?

4    A.    I don't know.

5    Q.    Okay.  Looking at the time frame from 2007 to the
6    present, what is your best estimate of the number of times
7    someone or all of the training department -- someone from or
8    all of the training department has visited the NCAC in
9    Santiago?

10    A.    I'm sorry, I didn't quite catch the first part of
11    your question.

12    Q.    Sure.  I'm trying to get your best estimate for how
13    many times someone from the training department or the
14    training department as a whole has visited the NCAC in Chile.

15    A.    If we're talking since 2007, it would be several.
16    They would stay for a long period of time.  I believe it to be
17    right around three months.  But I don't know exactly how many
18    times they would have gone.

19    Q.    Okay.  Now, you indicated that there would also be
20    subject matter experts that would have visited the NCAC in
21    Santiago.

22    Did I understand that correctly?

23    A.    Yes, ma'am.

24    Q.    What is a subject matter expert?

25    A.    It would be any agent that has a really good grasp

Page 85

```
1    of Experian's policies and procedures, that has been helpful
2    to other -- other employees as well.  And those people would
3    volunteer to travel to the Chilean office and participate in
4    the training program.
5         Q.   Would it be for a similar amount of time, like three
6    months?
7         A.   Yes, I believe so.
8         Q.   Okay.  Do you know any particular people by name
9    that have done that?
10        A.   Yes, I do.
11        Q.   Could you give those to me, please?
12        A.   One second.  Dorian Dickens.
13        Q.   Is that a male, or a female?
14        A.   Male.
15        Q.   Okay.  Anyone else?
16        A.   I'm sorry, one second.  Erica -- and I believe her
17   last name is Law, but she might have married since then.  I'm
18   not quite sure.  I'm just not coming up with any other names
19   right now, I'm sorry.
20        Q.   What is your best estimate of how many subject
21   matter experts have visited the Chilean office between 2007
22   and today?
23        A.   I'm not entirely sure about how many.  I -- I would
24   be guessing, but certainly more than three or four.  I just
25   don't know how many.
```

Page 86

```
 1      Q.   Okay.  What does Dorian Dickens do?
 2      A.   He is a quality agent.
 3      Q.   Do you know if that was his position back in 2007?
 4      A.   Yes, ma'am, it was.
 5      Q.   Do you know when he visited Santiago, Chile, what
 6 year?
 7      A.   I do not remember.
 8      Q.   Do you know if he's done it more than once?
 9      A.   I believe so.
10      Q.   Do you know how many times?
11      A.   No, I do not.
12      Q.   What about Erica Law, what is her position?
13      A.   I believe she's some sort of lead.  I'm not quite
14 sure what division she is in.  I'm -- it's -- I haven't seen
15 her in a few years.
16      Q.   What does that mean, that she's some sort of lead?
17      A.   Not a supervisor, but kind of in the medium between
18 a regular agent and the supervisor, someone that assists and
19 helps the other agents.
20      Q.   Now, earlier you indicated that there was a
21 specialty team that handled, for instance, fraud disputes or
22 allegations of mixed files.
23           Did I understand that correctly?
24      A.   Yes, ma'am.
25      Q.   Do you know if there is anyone from any -- from the
```

Page 87

```
 1   specialty team that has visited Santiago?
 2        A.   I know that that's the area that we would like to
 3   pull the agents from since they have a good grasp of the
 4   information.  I just can't think of one particular person
 5   off -- right now.
 6        Q.   Okay.  But as far as you know, Dorian Dickens and
 7   Erica Law were part of a specialty team?
 8        A.   Part of the quality team, so they would also have
 9   knowledge about mixed and fraud training as well.
10        Q.   Oh.  So Erica Law was part of the quality department
11   as well?
12        A.   Yes, ma'am.
13        Q.   Okay.  Well, am I using the phrase specialty team
14   correctly?  I mean, is there one specialty team?
15        A.   When I think of specialty team, I'm just not aware
16   of the people's names, so it's not something that I would be
17   familiar with if they traveled or not.  I do know the other
18   two representatives because I did work in QTC for a period of
19   time with them.  And that's the information I have knowledge
20   of.  Any kind of specialty team could be the team that handles
21   the allegations of fraud and mixed.
22        Q.   I guess what I'm trying to understand is, is there a
23   place where the specialty team sits as compared to other
24   agents?
25        A.   As far as the other agents, I -- QTC is -- is some
```

Page 88

```
 1      Q.   Okay.  Do they have access to the NIS --
 2      A.   Yes.
 3      Q.   -- system?  Do they have access to the CAPS system?
 4      A.   Yes.
 5      Q.   Do they have access to the Mainframe?
 6      A.   Yes.
 7      Q.   Do -- does anybody in the Santiago NCAC have access
 8  to the CPM?
 9      A.   I believe so, if they're trained how to do that.  I
10  just -- I just don't know specifically.
11      Q.   Well, do you know if there's a particular department
12  or division in the Santiago NCAC that processes transaction
13  logs?
14      A.   My understanding of that would be something what I
15  would call the back-end process.  So if the agents are
16  receiving the ACDVs and working them, I include that process
17  in there because it's very similar.  So there may be agents
18  that are trained as well, so there's -- could be agents that
19  are trained how to process ACDVs and transaction logs, so I --
20  I include them in the same.
21      Q.   Okay. We spent a lot of time talking about the
22  organizational structure of the NCAC in Allen, Texas.  I'd
23  like to shift focus and talk about the organizational
24  structure of the NCAC in Santiago, okay?
25                Can you describe for me the different
```

Page 110

```
 1   departments or divisions that are located in that NCAC?
 2       A.   My general understanding would be quite similar to
 3   the Allen NCAC.  I know that they -- they have a dispute
 4   division, back-end division that would handle the ACDVs or
 5   other information like that.  I'm not exactly sure of -- of
 6   how the structure is itself.  I -- I believe they would have a
 7   supervisor that would be similar to Allen.
 8       Q.   Now, you said supervisors similar to Allen.
 9            Supervisor of a particular department or
10   division, or over the entire NCAC?
11       A.   Each team, just like the teams in Allen, Texas,
12   would have a supervisor that would be responsible for a
13   certain amount of agents.  So that would be similar to the
14   Allen as well as the Santiago office.
15       Q.   Okay.  Does the Santiago NCAC have a quality
16   department?
17       A.   Yes, they do.
18       Q.   Do they have a special services department?
19       A.   Yes, they do.
20       Q.   Any other departments you can think of?
21       A.   I -- I just can't think of any others right now.
22       Q.   Okay.  What is your best estimate of the number of
23   individuals that are employed at the NCAC in Santiago?
24       A.   I'm not entirely sure.  Possibly around 200, 250.
25   I'm not -- I don't have a recent count.  I'm not entirely
```

Page 111

```
1    NCAC located in Santiago, Chile?
2        A.   I believe there is, I -- I just can't think of the
3    person's name, but I believe there to be.
4        Q.   Would that be someone that you have ever personally
5    communicated with?
6        A.   Quite possibly there was an introduction, if -- if
7    he's ever visited -- or she ever visited the NCAC Allen.  I
8    just can't think of the person right now.
9        Q.   Okay.  And that's what I was going to ask.
10            Do you know -- and I apologize -- I forget the
11   name of the senior vice president.
12            What was his name?
13       A.   Lee Lundy.
14       Q.   Lee Lundy.  Do you know if Mr. Lundy has ever been
15   to the NCAC in Santiago, Chile?
16       A.   Yes, he has.
17       Q.   Do you know an estimate of how many times?
18       A.   I know that he goes often.  I just -- I don't know
19   if it's monthly or every other month.  I know he goes often.
20       Q.   Do you know whether the senior vice president of the
21   NCAC in Santiago, Chile comes to the Allen, Texas office on
22   any regular basis?
23       A.   Not that I'm aware of on a regular basis.  Certainly
24   there has been visitations.  I don't remember anything
25   besides, you know, maybe one or two times.  I'm not entirely
```

Page 113

```
 1    might be less than the average.  If there's a particular agent
 2    that has another duty after they get the dispute training,
 3    might go to that department.
 4                So it just depends on -- on what their function
 5    is going to be.  If it's a mail dispute and a phone dispute --
 6    I'm sorry -- a phone dispute where they're getting the
 7    training as far as mail, too, then it would be the full 90
 8    days.
 9        Q.    Now, is there ever an instance where someone is
10    hired and immediately is trained to become a specialty agent
11    or a specially trained team member?
12        A.    There are times.  I guess it would be -- depend on
13    that particular situation and how much knowledge that person
14    would already have where it's possible they could have that as
15    part of their initial training.  I just can't think of a
16    particular instance, though.
17        Q.    Okay.  Now, in comparison to what you just described
18    as the training process for reinvestigations in Allen, Texas,
19    could you please describe for me the training process for
20    agents in Santiago, Chile?
21        A.    The participant guide is exactly the same.  The
22    length of time is -- is a little bit different and it has
23    changed over a period of time.  I believe the current one I
24    have knowledge of would be right around a six-month training
25    program and where the agents go through a process where just
```

Page 122

```
 1    to reverify the debt?
 2              MS. TAYLOR:  Object to the form.
 3         A.   What they're looking at is something that would be
 4    available within something called the D/R log.  So they're
 5    looking at what's being disputed, what's currently on file,
 6    and then they're also looking into the D/R log looking for if
 7    we've ever disputed information.
 8              And if it's an ownership dispute, we're going
 9    to look at the information that's currently being disputed,
10    and if it's been previously verified, the agents would send
11    the repeat dispute letter.
12         Q.   (BY MS. GOLDSMITH)  So you've indicated one of the
13    things you would expect the agent to do is look at the D/R
14    log?
15         A.   It's not in a printed form.  It is something all
16    within CAPS.  So CAPS system has not only the consumer's file,
17    but also has the -- the logs that associate with that
18    particular consumer's file.
19         Q.   Well, whether it's in printed form or not, would you
20    expect the agent to go into the CAPS system and look at the
21    D/R log information?
22         A.   Yes, that's what they're trained to do.
23         Q.   Do you know if the particular agent in this instance
24    did that?
25         A.   Since I was not standing next to the agent that
```

Page 172

```
 1    actually processed the piece of mail, I can't -- I can't tell
 2    you whether or not the agent did that, but I can tell you that
 3    that's what they're trained to do.
 4         Q.   Well, is there a way to track whether a particular
 5    agent went into the CAPS system on a particular time and date?
 6         A.   Yes, you can track to where an agent would access
 7    CAPS, but not -- not logs.  It would just -- it would just
 8    capture the actual access itself.
 9         Q.   Well, for instance, if we know that a particular
10    dispute was received on a particular day and an entry was made
11    on the D/R log on a particular day, we could check to see -- I
12    guess that's a stupid question -- is did they access the D/R
13    log -- or did they enter something that would show up on the
14    D/R log, that would be the entrance into the CAPS, correct?
15         A.   That's correct.
16         Q.   Okay.  Could you explain to me what else
17    Mr. Calderon could have done to get Experian to delete this
18    judgment from his credit report shy of filing a lawsuit?
19              MS. TAYLOR:  Object to the form.  You can
20    answer.
21         A.   Because Mr. Calderon filed a lawsuit was not the
22    reason for the information to be deleted.  Each time a
23    consumer contacts Experian, we're going to look at every --
24    going to look at -- read the piece of mail to look for the
25    reason why something is being disputed.
```

Page 173